**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| IN RE: | |
| **MICHAEL J. FLETCHER and LORI JEAN FLETCHER,** | **Case No. 11-12334-M**<br>**Chapter 7** |
| Debtors. | |

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | |
| v. | **Adv. No. 11-01116-M** |
| **MICHAEL J. FLETCHER and LORI JEAN FLETCHER,** | |
| Defendants. | |

## MEMORANDUM OPINION

In the world of bankruptcy, a debtor's discharge is rarely denied by summary judgment. Most grounds for denial of a discharge require a finding that a debtor intended to mislead, conceal, or deceive. Although there are some undisputed facts in almost every case, it is difficult to have no genuine dispute of fact regarding an individual's subjective intent. In this case, the plaintiff claims that the debtors have engaged in a concerted effort to conceal assets, most notably a house, and failed to explain what happened to other assets prior to the filing of their bankruptcy case. Plaintiff seeks judgment as a matter of law on these claims. The debtors disagree, arguing that disputes of fact exist and they are entitled to their day in court. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and venue is proper pursuant to 28 U.S.C. § 1409.[1]  Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a).  This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(I) and (J).

## Summary Judgment Standard

In its most recent pronouncement on the matter, the United States Court of Appeals of the Tenth Circuit has held that

> Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998). "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Id.* Put differently, "[t]he question . . .  is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Shero v. City of Grove,* 510 F.3d 1196, 1200 (10th Cir. 2007) (quotation omitted). "On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quotation omitted).[2]

The Court will apply this standard to the Motion.

## Findings of Fact

Michael J. Fletcher and Lori Jean  Fletcher (the "Fletchers" or the "Debtors") filed an original petition for relief under Chapter 7 of the United States Bankruptcy Code on August 12,

---

[1]  Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

[2]  *Becker v. Bateman*, Case No. 11-4054, __ F.3d __, 2013 WL 697910 (10th Cir. Feb. 27, 2013).

2011.[3]  In their schedules, the Fletchers listed the United States of America, acting through the Internal Revenue Service (the "IRS") as a creditor holding priority claims in excess of $281,000, and unsecured non-priority claims in excess of $2,000,000.[4]

On November 4, 2011, the IRS filed this adversary proceeding, seeking an order denying the Fletchers a discharge in their Chapter 7 case, or, in the alternative, a finding that the claim owed the IRS is not dischargeable.  The IRS alleges that the Fletchers have attempted to conceal their ownership interest in a house located in Tulsa, Oklahoma, and also failed to explain a significant pre-petition loss of assets.  The Fletchers deny these allegations.

This adversary proceeding has been pending for almost sixteen months.  Discovery is closed. On December 20, 2012, the IRS filed its motion for summary judgment (the "IRS Motion"), claiming that no dispute of material fact exists and that the Debtors' discharge should be denied as a matter of law, or, at a minimum, the claims of the IRS should not be discharged.[5]  The Fletchers have filed a timely resistance to the motion.[6]  The IRS Motion is supported by various pleadings, depositions, exhibits, and affidavits.  Debtors have objected to some of the evidence proffered by the IRS, and have offered evidence of their own.  The Court has reviewed the evidence presented to it and finds several material facts in this adversary proceeding are not in genuine dispute.

Specifically, the Court finds that there is no genuine dispute as to the following material facts:

---

[3]  *Case No. 11-12334-M.*

[4]  *Id. at Docket No. 1, pp. 18, 20 – 22.*

[5]  *Docket No. 22* (hereafter the "IRS Motion").

[6]  *Docket No. 28* (hereafter the "Resistance").

1.      In 1998, the Fletchers incurred $1.6 million in federal income taxes based on their income of $7.2 million.

2.      In 1999, the Fletchers incurred $378,000 in federal income taxes based on their income of $2.0 million.

3.      The Fletchers failed to timely file their 1998 income-tax return: the 1998 return was due on August 15, 1999, but the Fletchers filed it on May 8, 2000.

4.      Between 1998 and 2002, the Fletchers paid $416,641 toward their 1998 income taxes and $16,557 toward their 1999 income taxes.

5.      During the same period, the Fletchers used their cash—which they had realized from a 1998 initial public offering of Michael Fletcher's company—to build an 11,000-square-foot house (the "Sheridan Oaks House") in a gated community in Tulsa, Oklahoma.[7]

6.      The Fletchers moved into the Sheridan Oaks House in December 2002, furnishing it with art and antiques that they had purchased, between 1998 and 2000, for more than $460,000.

7.      In October 2004, the IRS sued the Fletchers for a judgment on their 1998 and 1999 income taxes and to foreclose its liens on the Sheridan Oaks House.

---

[7] The Fletchers dispute this allegation, arguing that "the situation was more complicated" than as outlined by the IRS.  *See Resistance at ¶ 3.*  Notwithstanding this statement, the Fletchers offer no evidence to dispute the fact that they used funds obtained from a public stock offering to construct the Sheridan Oaks House.  The evidence offered by the IRS in support of this allegation is the testimony of Michael Fletcher given at the first meeting of creditors.  *See IRS Motion, Exh. 32* at 81, *ll.* 7–10.  The testimony of Michael Fletcher at the first meeting of creditors was given under oath, and is admissible under Federal Rule of Evidence 801(d)(2). The Court finds the fact as alleged by the IRS is not in genuine dispute.

8.      In February 2006, the Fletchers consented to a $2.7 million judgment for those taxes and agreed that the United States could auction off the Sheridan Oaks House if they were unable to sell it privately by a date certain.[8]

9.      On May 29, 2008, the Sheridan Oaks House was sold by private sale for $2.85 million; after payment of senior liens and sale expenses, the United States received approximately $1.75 million of the proceeds.

10.     In April 2008—a month before the sale of the Sheridan Oaks House—Michael and Lori Fletcher contracted with Christopoulos Construction, LLC (the "April Contract") to purchase a newly constructed, 4,700-square-foot house located at 6209 E. 110th Street in Tulsa, Oklahoma (the "110th Street Property") for $735,000.[9]

11.     The April Contract called for the Fletchers to pay a $5,000 earnest-money deposit and for settlement to occur on or before May 19, 2008.

12.     In attempting to finance their purchase of the 110th Street Property, Michael Fletcher discussed the possibility of obtaining a mortgage loan with an individual named

---

[8] The Fletchers dispute this fact, contending that the order referred to was later modified to allow the Fletchers to pursue a private sale of the Sheridan Oaks House and noting that the Sheridan Oaks House was ultimately sold to a private buyer located by the Fletchers. The Court accepts each of these statements by the Fletchers, as they are supported by documentary evidence submitted by the IRS. *See IRS Motion, Exh. 8.* The additional facts advanced by the Fletchers do not create a dispute with respect to the facts alleged by the IRS in this paragraph.

[9] The Fletchers claim that the April Contract was executed for the benefit of John Fletcher pursuant to a power of attorney (the "POA") executed on April 1, 2008, a date that is one day before the Fletchers executed the April Contract. *See Resistance, Exh. 2.* Although the POA is notarized, the notary did not state the date she allegedly witnessed the signature by John Fletcher. While the POA only appoints Michael Fletcher as attorney in fact for John Fletcher with respect to the purchase of the 110th Street Property, both Michael and Lori Fletcher executed the April Contract. The Court finds a dispute of fact exists with respect to the timing and validity of the POA.

Jason Hadrava.[10]

13.    The Fletchers devised a plan to have one of Michael Fletcher's employees, Tim Long, purchase the 110th Street Property and lease it back to them.[11]

14.    In May 2008, the Fletchers signed an addendum that assigned their rights under the April Contract to Timax Properties, LLC,  a company owned by Tim Long.

15.    Tim Long and Timax Properties, LLC were unable to obtain financing to purchase the 110th Street Property.  As a result, in June 2008 Michael Fletcher proposed to the seller (Christopoulos Construction) that he and Lori Fletcher lease the property while they attempted to obtain the financing to purchase it.

16.    In June 2008, Michael Fletcher and Christopoulos Construction entered into a new contract for the purchase and sale of the 110th Street Property (the "June 2008 Contract").   Under that contract, the purchase price remained at $735,000, the closing date was set for January 5, 2009, and Michael Fletcher agreed to provide an additional deposit of $235,000.  The June 2008 Contract acknowledged that the Fletchers had already made a $5,000 earnest-money deposit and expressly provided that additional deposits could be made before the closing.[12]

---

[10]  The IRS contends that "Michael Fletcher applied for a mortgage loan with a company owned by Jason Hadrava." *IRS Motion* at ¶12.  The deposition testimony relied upon by the IRS does not support this statement.  There may have been some discussions with Mr. Hadrava regarding financing for the 110th Street Property, but there is no evidence that a formal loan application was completed.

[11]  The Fletchers deny this allegation for reasons that are unclear.  In the Resistance, they admit that Mr. Long was to purchase the 110th Street Property and lease it to the Fletchers. *See Resistance at ¶ 7.*

[12]  For reasons unknown, Lori Fletcher did not sign the June 2008 Contract.

6

17.     At the same time, the Fletchers and Christopoulos Construction entered into a lease that allowed the Fletchers to occupy the 110th Street Property through January 5, 2009.[13]

18.      As required by the June 2008 Contract, on or about June 13, 2008, Michael Fletcher delivered to Dean Christopoulos a cashier's check in the amount of $235,000 (the "Christopoulos Cashier's Check"). On the face of that check, Michael Fletcher is identified as the purchaser.

19.     Bank records reveal that Michael Fletcher purchased the Christopoulos Cashier's Check using two sources: (i) a $230,000 cashier's check payable to (and endorsed by) Tim Long (the "Tim Long Cashier's Check"), and (ii) $5,000 in cash that had been withdrawn from a bank account at Bank of America (the "Stonehenge Account") owned by Stonehenge Partners, Inc. ("Stonehenge") — a company that Michael and Lori Fletcher owned.[14]

20.     Bank records reveal that Michael Fletcher purchased the Tim Long Cashier's Check

---

[13]  The Fletchers dispute this fact, claiming that the lease at issue was not signed.  The Fletchers offer no evidence in support of their denial.  A copy of the lease at issue was attached to the declaration of Dean Christopoulos attached to the IRS Motion as Exhibit 23.  In that declaration, Mr. Christopoulos states under penalty of perjury that the Fletchers executed the lease.  Exhibit 4 to the declaration is a copy of the lease, and said lease appears to have been signed by Michael Fletcher and Lori Fletcher.  The Court finds there is no genuine dispute with respect to the execution of the lease.

[14]  In this paragraph, the IRS alleged that Stonehenge was a company that both of the Fletchers "owned and controlled."  The Fletchers take issue with the statement that Stonehenge was controlled by Lori Fletcher, or that the evidence supports any finding regarding the involvement of Lori Fletcher in the affairs of Stonehenge.  The Court agrees.  The involvement of Lori Fletcher, if any, in the affairs of Stonehenge, is not established for purposes of the IRS Motion.

on June 11, 2008, using money withdrawn from the Stonehenge Account.

21.     Less than a month before Michael Fletcher used funds in the Stonehenge Account
to purchase the Tim Long Cashier's Check, Michael Fletcher arranged to have
$350,000 deposited into that account.[15]

22.     In May 2008, Susan Kapuchuck, the owner of an antiques store in Claremore,
Oklahoma, agreed to pay the Fletchers $100,000 for various of the Fletchers'
antiques. Around that time, Michael Fletcher instructed Ms. Kapuchuck to make the
payment by direct transfer into the Stonehenge Account.

23.     On May 16, 2008, the $100,000 payment from Ms. Kapuchuck was deposited into
the Stonehenge Account.

24.     In May 2008, the Fletchers also made two agreements to sell various antiques and
household furnishings to Carlos and Pamela Langston, the buyers of the Sheridan
Oaks House. The first agreement, which was in writing, called for the Langstons to
make four installment payments totaling $223,750. The first installment, in the
amount of $100,000, was paid on May 29, 2008—which was the date of the closing
on the Sheridan Oaks House. The remaining installment payments were paid monthly

---

[15]  The Fletchers admit the deposit of the $350,000 into the Stonehenge Account, but
dispute the source of the funds. In support of their denial, the Defendants attach Exhibit 7,
which they claim is a list of the items actually sold. *See Resistance at ¶ 13 and Exh. 7.* The
Fletchers have provided no foundation for Exhibit 7, and the IRS objects to the exhibit on that
basis. The objection is sustained. The Court gives no weight to Fletchers' Exhibit 7. The Court
will deal further with the dispute regarding the source of the $350,000 in the succeeding
paragraphs.

between July and September 2008.[16]

25.    All of those installment payments were transferred by wire into the Stonehenge Account.

26.    The Fletchers' second agreement with the Langstons was oral. Under that agreement, the Fletchers sold to the Langstons various chandeliers in the Sheridan Oaks House for $150,000.

27.    The $150,000 payment for the chandeliers was transferred by wire into the Stonehenge Account on May 29, 2008.

28.    Michael Fletcher instructed Mr. Langston to make the installment payments and the $150,000 chandelier payment by wire transfer into the Stonehenge Account.

29.    The Fletchers received a total of $473,750 from Ms. Kapuchuck and the Langstons in 2008.[17]

30.    At the official meeting of creditors, however, Michael Fletcher testified that the Fletchers received $140,000 from the sale of their household furnishings in 2008.

31.    By an agreement signed on July 9, 2009 (the "Three-Party Agreement"), the Fletchers, Christopoulos Construction, and John Fletcher agreed that the $240,000

---

[16]  While there is no dispute regarding the payments made by the Langstons, there is a dispute as to what was actually purchased.  The Fletchers argue that the exhibit offered to support this allegation – namely, the purchase agreement between the parties – is missing its Exhibit "A," the list of items allegedly sold.  The point is well taken.  The Fletchers argue that their Exhibit 7 is a list of the items sold to the Langstons, edited only to show the true owners of the property transferred.  As previously noted, the IRS has objected to Exhibit 7, and the Court has not admitted the exhibit.  On the record before it, the Court cannot make an exact determination as to what was sold to the Langstons.

[17]  Again, the source of the funds (i.e., what was sold and who owned it) is disputed.  The record does not allow the Court to make a determination on this issue.

9

paid by the Fletchers under the June 2008 Contract would be applied toward the purchase price under a new contract for the sale of the 110th Street Property between John Fletcher and Christopoulos Construction.  John Fletcher paid no consideration to the Fletchers for this agreement.

32.     On the same day of the Three-Party Agreement (July 9, 2009), Christopoulos Construction contracted to sell the 110th Street Property to John Fletcher for $735,000.

33.     On or about July 13, 2009, John Fletcher applied for a mortgage loan from Associated Mortgage Corporation ("Associated Mortgage").

34.     In connection with that application, John Fletcher sent Associated Mortgage a letter, signed by Michael Fletcher and John Fletcher, stating that Michael Fletcher had or would give John Fletcher a gift of $240,000 that John Fletcher would use as down payment towards the purchase of the 110th Street Property (the "Gift Letter").[18]

35.     John Fletcher subsequently withdrew his application with Associated Mortgage.  On or about August 31, 2009, John Fletcher applied for a mortgage loan with Regent Bank.  In September 2009, he borrowed $500,000 from Regent Bank and, together with his wife, Marilyn, took title to the 110th Street Property.

36.     In connection with John Fletcher's application with Regent Bank, Michael Fletcher told a loan officer there that Michael Fletcher was the source of the $240,000 down payment that John Fletcher would use to purchase the 110th Street Property and that

_____

[18] *Docket No. 22, Exh. 9.*

Michael Fletcher had already paid that amount to the seller.[19]

37.   Michael Fletcher also told the Regent Bank loan officer that the source of down-payment funds were proceeds of the sale of his antiques and other personal property.[20]

38.   Since at least June 2008, the Fletchers have resided in the 110th Street Property. From June 2008 to September 2009 they leased it from Christopoulos Construction for $5,000 per month.  Since September 2009 the Fletchers claim to have leased the 110th Street Property from John Fletcher for $3,600 per month.

39.   Although John Fletcher is the maker on the mortgage note with Regent Bank, the Fletchers have made all of the payments on that note directly to the holder of the note and mortgage on the 110th Street Property.[21]

40.   John Fletcher claims that he and his wife, on occasion, have lived in the 110th Street Property, but at his July 2012 deposition John Fletcher could not recall the dates he was there other than during Christmas and Easter of 2011.  In correspondence with Regent Bank in September 2010 (a year after the closing), John Fletcher listed his

---

[19]   Debtors dispute the facts in this statement as based upon inadmissible hearsay.  That objection is overruled.  The statements are the admissions of Michael Fletcher, a party to this adversary proceeding, and thus admissible under Federal Rule of Evidence 801(d)(2).  The Fletchers also argue that even if the statements are admissible, there is no mention of any damaging statements by Lori Fletcher.  This is correct.

[20]   Debtors dispute the facts in this statement as based upon inadmissible hearsay.  That objection is overruled.  The statements are the admissions of Michael Fletcher, a party to this adversary proceeding, and thus admissible under Federal Rule of Evidence 801(d)(2).  The Fletchers also argue that even if the statements are admissible, there is no mention of any damaging statements by Lori Fletcher.  This is correct.

[21]   The Fletchers admit this arrangement with the caveat that the arrangement is "for the convenience of John and Marilyn Fletcher."  *Resistance at ¶ 18.*

primary residence as a house in Poplar Grove, Illinois.  At his July 2012 deposition, John Fletcher testified that he resided in Poplar Grove, Illinois.

41.  John Fletcher claims that he borrowed the money he used as the down payment on the 110th Street Property from his granddaughters, Amanda Fletcher ("Amanda") and Katherine Fletcher ("Katherine").

42.  Michael Fletcher and Lori Fletcher also claim, in responses to interrogatories in this proceeding, that Amanda and Katherine were the source of the down payment.

43.  As evidence of this debt, the Fletchers rely upon a promissory note (the "Note") that they claim John Fletcher issued to Amanda and Katherine.[22]

44.  The Note, dated April 1, 2008, is in the amount of $250,000 and is payable to Amanda and Katherine and their two trusts.

45.  The Note bears a notary seal of one of Michael Fletcher's employees and purports to contain the signatures of Amanda and Katherine, as witnesses.

46.  Katherine did not sign the Note and did not appear before the notary when the Note was executed.

47.  There is no documentary evidence of any transfer of funds from Amanda and Katherine, or their trusts, to John Fletcher.

48.  John Fletcher testified that he did not recall where the proceeds of the Note were deposited and that Michael Fletcher took control of the Note's proceeds.

49.  John Fletcher testified that the reason for the lag between the date he claims to have signed the Note (April 1, 2008) and the date he and his wife purchased the 110th

---

[22]  The IRS has described the Note as "manufactured evidence."

Street Property (September 30, 2009) was that the closing "took an extraordinar[ily] long time to complete."

50.    John Fletcher did not enter into a contract to purchase the 110th Street Property until July 2009.

51.    John Fletcher admits that no payments have been made on the Note and that its balance, as of July 2012, exceeds $250,000.[23]

52.    John Fletcher admits that he did not disclose his liability on the Note when he made his loan application to Associated Mortgage in July 2009.[24]

53.    John Fletcher did not disclose his purported liability on the Note when he submitted a financial statement to Regent Bank in August 2009.

54.    John Fletcher did not disclose his liability on the Note when he submitted a second financial statement to Regent Bank in September 2010.

55.    As to the Gift Letter, John Fletcher claims that he was playing his role in a charade that the mortgage company was aware of.

56.    The Fletchers filed a joint Chapter 7 petition on August 12, 2011.

57.    The Fletchers listed no real property on their bankruptcy schedules.

58.    At the meeting of creditors, Michael Fletcher testified that his children's trusts provided the down payment for the purchase of the 110th Street Property, that he did

---

[23]  These facts are admitted by the Fletchers with the caveat that no payments are due on the Note until June 30, 2013.

[24]   The Fletchers deny this fact, apparently based upon statements by John Fletcher that the loan officer for Associated Mortgage was a "disaster." *Resistance, ¶ 21 and Exh. 14*.   John Fletcher admits in his deposition that he did not disclose the loan from his granddaughters in the loan application.  *See IRS Motion, Exh. 18.*  There is no genuine dispute regarding this fact.

not contribute to the down payment, and that he had no ownership interest in that property.

59.     In May 2012, the Fletchers answered interrogatories in this adversary proceeding in which they claim that Amanda and Katherine were the source of the down payment used to purchase the 110th Street Property.

60.     In September 2009, Michael Fletcher submitted a personal financial statement to Regent Bank.

61.     According to that statement, the Fletchers at that time owned personal property—in the form of art, antiques, collectibles, and other household furnishings—worth more than $688,000.

62.     The financial statement included a spreadsheet providing piece-by-piece details—purchase date, dealer, item description, and original purchase price—for art and antiques worth over $460,000.

63.     On their bankruptcy schedules, the Fletchers listed only $8,600 in household goods and furnishings, and they listed no antiques or collectibles.

**Conclusions of Law**

*Section 727(a)(2)(A)*

Section 727(a)(2)(A) of the Code provides that a discharge may be denied where "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the

14

debtor, within one year before the date of the filing of the petition[.]"[25]  A party objecting under this section must show by a preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the debtor or estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor.[26]  "To deny a discharge under § 727(a)(2), a court must find *actual* intent to defraud creditors.  Because rare is the occasion when a party lays bare his or her subjective intent, fraudulent intent . . . may be established by circumstantial evidence, or by inferences drawn from a course of conduct."[27]  Among the badges or indicia from which a court may infer fraudulent intent are "situations in which a debtor conceals prebankruptcy conversions; converts assets immediately before the filing of the bankruptcy petition; gratuitously transfers property; continues to use transferred property; and transfers property to family members."[28]  The Court of Appeals for the Tenth Circuit has stated that "the inference of fraudulent behavior flowing from a concealment is greater than from a transfer[.]"[29]

The IRS claims that the Fletchers own the 110th Street Property, and attempted to conceal their ownership through a series of events designed to hide the source of the funds for the down payment on the 110th Street Property and place legal title to the 110th Street Property in the name of John Fletcher.  The IRS points to several facts, including:

     1.     The use of funds from the Stonehenge Accounts to make the down payments on the

---

[25] § 727(a)(2)(A).

[26] *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008) (citing *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997)).

[27] *Id.* (internal quotations and citations omitted).

[28] *In re Carey*, 938 F.2d 1073, 1077 (10th Cir. 1991) (citations omitted).

[29] *In re Brown*, 108 F.3d at 1293 n.1.

110th Street Property;[30]

2.     The Fletchers reside in the 110th Street Property;[31]

3.     The Fletchers pay the exact amount of the mortgage each month as "rent," and pay the sums directly to the mortgage company instead of to John Fletcher;[32]

4.     John Fletcher resides in Illinois, and not in the 110th Street Property;[33]

5.     Notwithstanding the claim of the Fletchers and John Fletcher that the down payment for the 110th Street Property came from funds borrowed from Katherine and Amanda, John Fletcher never disclosed the alleged loan in any of his loan applications;[34]

6.     Michael Fletcher executed the Gift Letter stating that he provided the $240,000 down payment on the 110th Street Property to John Fletcher as an unconditional gift, only to later contend that the $240,000 is in fact money loaned.[35]

Put simply, the position of the IRS is that the Fletchers live in the 110th Street Property, made the down payment on the 110th Street Property, and have made and continue to make each and every monthly mortgage payment with respect to the 110th Street Property. By inference, if it looks like

---

[30] *Findings of Fact ("FOF")* 19, 20.

[31] *FOF* 38.

[32] *FOF* 38 and 39.

[33] *FOF* 40.

[34] *FOF* 52, 53, and 54.

[35] *FOF* 34, 43, and 44.

a duck, walks like a duck, and quacks like a duck, says the IRS, it must be a duck.[36]

The undisputed facts expose various inconsistencies in the position taken by the Fletchers. For example, the Fletchers claim that they entered into the April Contract to purchase the 110th Street Property pursuant to the POA, authorizing them to purchase the 110th Street Property on behalf of John Fletcher. If that is true, then one is left to ponder why, on May 10, 2008, after the POA was supposedly signed, the Fletchers executed a document purporting to assign their interest in the contract for the purchase of the 110th Street Property to Timax Properties, LLC. As another example, if John Fletcher actually borrowed $240,000 from Amanda and Katherine on April 1, 2008, why did he not apply for a loan to purchase the 110th Street Property until the summer of 2009? On the basis of this evidence, the IRS asks the Court to infer that the Fletchers are the true owners of the 110th Street Property and are attempting to conceal their ownership in this bankruptcy case.

The problem is that we are here on a motion for summary judgment. As recently as February 27, 2013, the United States Court of Appeals for the Tenth Circuit has instructed this court that, for purposes of ruling on summary judgment motions, "the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion."[37] The command makes it difficult to find fraudulent intent at the summary judgment stage of any adversary proceeding.[38] While the IRS has correctly cited an excellent decision of the Bankruptcy Appellate

---

[36] A turn of phrase often attributed to the poet James Whitcomb Riley (1849–1916) and once used famously by former news anchor Dan Rather.

[37] *Becker v. Bateman,* Case No. 11-4054, ___ F.3d. ____, 2013 WL 697910 (10th Cir. February 27, 2013), at *1 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[38] "As a general rule, questions involving a person's intent or other state of mind cannot be resolved by summary judgment." *In re Herrman*, 355 B.R. 287, 291 (Bankr. D. Kan. 2006). *See also Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980); *Buell Cabinet Co. v.*

Panel of the Tenth Circuit dealing with the inferring of fraudulent conduct, that appeal involved findings of fact and inferences drawn <u>after trial of the adversary proceeding, and not as part of a ruling on a motion for summary judgment</u>.[39]

The Court concludes that it would be inappropriate for it to grant summary judgment denying the Fletchers a discharge under § 727(a)(2)(A).

### Section 727(a)(4)(A)

Section 727(a)(4)(A) of the Code provides that a discharge may be denied where "the debtor knowingly and fraudulently, in or in connection with the case . . . (A) made a false oath or account[.]"[40] The United States Court of Appeals for the First Circuit has held that

> the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.[41]

The Fourth Circuit has held that

> [i]n order to be denied a discharge under [§727(a)(4)(A)], the debtor must have made a statement under oath which he knew to be false, and he must have made the

---

*Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Questions of intent involve many intangible factors, such as witness credibility, that are best left to the consideration of a factfinder after a full trial."); *In re Nevarez*, 415 B.R. 540, 544 (Bankr. D.N.M. 2009); *see* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2730 (3d ed. 1998).

[39] *U.S. Trustee v. Garland (In re Garland)*, 417 B.R. 805 (10th Cir. BAP 2009).

[40] § 727(a)(4)(A).

[41] *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) (citations omitted).

18

statement willfully, with intent to defraud. The false oath made by the debtor must have related to a material matter. Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact.[42]

A statement contained in a debtor's schedules or statement of affairs, or the omission of assets from the same may constitute a false oath for purposes of § 727(a)(4)(A).[43]  Because the debtor is usually the only person able to testify directly concerning intent, "fraudulent intent may be deduced from the facts and circumstances of a case."[44]

The United States Court of Appeals for the Tenth Circuit has given us further guidance in the application of § 727(a)(4)(A).  It has held that "[a] debtor will not be denied discharge if a false

---

[42] *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987) (citations omitted).  *See also Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997) ("In order to deny a debtor's discharge pursuant to [§ 727(a)(4)(A)], a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact.").

[43] *See Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir. 1990).

[44] *Id.* at 955-56.  Although not directly on point, the Court has found helpful certain cases dealing with revocation of discharge for failure to disclose assets under § 727(d)(2).  The United States Court of Appeals for the Seventh Circuit has held that

> [t]o find the requisite degree of fraudulent intent, the court must find the debtor knowingly intended to defraud the trustee, or engaged in such reckless behavior as to justify the finding of fraud.  The trustee may prove the debtor's fraud by evidence of the debtor's awareness of the omitted asset and by showing that the debtor knew that failure to list the asset could seriously mislead the trustee or that the debtor acted so recklessly in not reporting the asset that fraud is implied.  The bankruptcy court's finding of fraudulent intent may be based on inferences drawn from a course of conduct.  Additionally, fraudulent intent may also be inferred from all of the surrounding circumstances.

*In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992) (citations omitted).  *See also Kaler v. Olmstead (In re Olmstead)*, 220 B.R. 986, 994 (Bankr. D.N.D. 1998) (quoting *Yonikus*); *Rezin v. Barr (In re Barr)*, 207 B.R. 168, 176 (Bankr. N.D. Ill. 1997) (fraud "may be proven by evidence that Debtors were aware the omitted assets existed and that they knew failure to list the assets would mislead creditors or the Trustee").

statement is due to mere mistake or inadvertence,"[45] and also held that "an honest error or mere inaccuracy is not a proper basis for denial of discharge."[46]  We also know that a debtor may not escape a denial of discharge under § 727(a)(4)(A) by asserting that the omitted information concerned assets that he or she believed to be worthless.[47]

The Court has the same problem with the claims under § 727(a)(4)(A) as it did with the cause of action brought under § 727(a)(2)(A).  In order to rule in favor of the IRS, it must find that the Fletchers owned the 110th Street Property.  It must draw inferences unfavorable to the Fletchers in order to do so.  It must draw additional inferences in order to determine that the Fletchers intended to deceive the Court and creditors as they failed to disclose their ownership interest in the 110th Street Property.  The Court cannot draw such inferences in the course of ruling upon a motion for summary judgment.[48]

The IRS also argues that there are many inconsistencies in the explanations and evidence presented by the Fletchers, and that these inconsistencies demonstrate that there is no genuine dispute of material fact with respect to the facts advanced by the IRS.  The Court disagrees.  While such inconsistencies may serve to weaken the position taken by the Fletchers, they do not prove the position taken by the IRS.  The IRS is asking the Court to weigh the evidence and grant the IRS the benefit of any inferences to be drawn therefrom.  The United States Court of Appeals for the Tenth Circuit has told this Court to do the opposite.  Paper wraps rock, rock breaks scissors, scissors cut

---

[45]  *In re Brown*, 108 F.3d at 1294.

[46]  *Id.* at 1295.

[47]  *In re Calder*, 907 F.2d at 955 (citing *In re Chalik*, 748 F.2d 616 (11th Cir. 1984)).

[48]  *See Note 38  supra.*

paper and, when it comes to questions of law before this Court, the United States Court of Appeals for the Tenth Circuit trumps the IRS.

### Section 727(a)(5)

Section 727(a)(5) provides that:

(a) The court shall grant the debtor a discharge, unless–

\* \* \* \* \* \* \*

> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.][49]

In order to deny a debtor's discharge under § 727(a)(5), a creditor must prove facts that establish loss or reduction of the debtor's assets by a preponderance of the evidence.  Once a creditor meets its burden of proof, the burden then shifts to the debtor to explain the loss or deficiency of assets in a satisfactory manner.[50]  As one court has noted,  "[a] cause of action advanced under § 727(a)(5) is not a substitute for one based on alleged pre-petition fraud, conversion or other malfeasance."[51]

In this case, the IRS points to the values of property on a September 2009 financial statement ($688,000) and the value of personal property in the Fletchers' schedules ($8,600).  The Fletchers respond by noting that the original exhibit relied upon by the IRS does not contain a list of property, and also contend that any values relied upon by the IRS reflect the original purchase price of the property, and not its present value, nor its value when sold.

The Court believes that the best place to resolve this dispute is at trial.  Section 727(a)(5) and

---

[49] § 727(a)(5).

[50]   *Crane v. Morris (In re Morris)*, 302 B.R. 728, 742 (Bankr. N.D. Okla. 2003) (citing *Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 618 (10th Cir. BAP 2001).

[51]   *In re Straub*, 192 B.R. 522, 525 (Bankr. D.N.D. 1996).

the case law interpreting it provide a debtor with an opportunity to explain any loss or diminution of assets. The Fletchers have offered a brief explanation of what happened. Their explanation is enough to create a factual dispute.

*§ 523(a)(1)(C)*

In the alternative, the IRS has asked that the claims owed to it be determined non-dischargeable under § 523(a)(1)(C). The section prevents discharge of any tax "with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax."[52] The IRS argues that the attempts by the Fletchers to conceal their ownership of the 110th Street Property fall within the parameters of § 523(a)(1)(C). Once again, we have questions of willfulness and intent. The Court finds that the same issues that prevent summary judgment on the various causes of action brought by the IRS under § 727 preclude summary judgment on the § 523(a)(1)(C) claim as well.

### Conclusion

The United States' Motion for Summary Judgment is denied. The facts listed in this Memorandum Opinion at Nos. 1 through 63 are deemed established for purposes of this adversary proceeding. The parties shall submit a proposed pretrial order in this adversary proceeding on or before April 19, 2013.

A separate judgment consistent with this Memorandum Opinion is entered concurrently

---

[52] § 523(a)(1)(C).

herewith.

Dated this 18th day of March, 2013.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

6522.4

23