# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Mar 13, 2015

IN RE:

MICHAEL J. FLETCHER and LORI
JEAN FLETCHER,

          Debtors.

Case No. 11-12334-M
Chapter 7

UNITED STATES OF AMERICA,

          Plaintiff,

v.

MICHAEL J. FLETCHER and LORI
JEAN FLETCHER,

          Defendants.

Adv. No. 11-01116-M

## MEMORANDUM OPINION

*"Honesty may not always pay, but lying always costs."*[1]

A discharge of indebtedness in bankruptcy is reserved for the "honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy."[2]  One of the debtor's duties in any bankruptcy case is to fully disclose his or her assets and liabilities.  The income tax system in this country relies on many of the same principles as the bankruptcy system: namely, candor, cooperation, and disclosure.  In the area of income taxation, failure to fully disclose income  and pay taxes owed results in penalties, interest, and, in extreme cases, incarceration.  In

---

[1]  Michael Josephson, *Importance of Trust and the Insidiousness of Lying in Business and Life*, Business Ethics & Leadership by Michael Josephson (Dec. 3, 2014), http://josephsoninstitute.org/business/blog/2014/12/importance-of-trust-and-the-insidiousness-of -lying-in-business-and-life/

[2]  *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).

the bankruptcy arena, the concealment of assets is grounds for denial of a debtor's discharge. When the worlds of taxation and bankruptcy collide, a debtor who fails to pay taxes and conceals assets faces denial of his or her discharge and imposition of penalties under the United States Tax Code.

This case pits the Internal Revenue Service against an individual Chapter 7 debtor, with the bankruptcy discharge hanging in the balance. The operative facts include millions of dollars in unpaid taxes, the construction of an expensive home, and the acquisition of a large quantity of furniture and antiques. The Internal Revenue Service claims that the debtor has intentionally concealed assets from both the Internal Revenue Service and this Court, an allegation that (not surprisingly) the debtor denies. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and venue is proper pursuant to 28 U.S.C. § 1409.[3] Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a). This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(I) and (J).

## Findings of Fact

Michael J. Fletcher ("Michael Fletcher" or "Defendant") and Lori Jean Fletcher ("Lori Fletcher," together, the "Fletchers") received a large one-time capital gain from the sale of a business in 1998 and 1999. The United States of America, acting through the Internal Revenue Service (the "IRS" or "Plaintiff") has been pursuing them ever since to collect the tax owed on that capital gain. On August 12, 2011, the Fletchers filed an original petition for relief under Chapter

---

[3] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

7 of the United States Bankruptcy Code.[4]  In their schedules, the Fletchers listed the IRS as a creditor holding priority claims in excess of $281,000, and unsecured non-priority claims in excess of $2,000,000.[5]

The IRS filed this adversary proceeding seeking an order denying the Fletchers a discharge in their Chapter 7 case, or, in the alternative, a finding that the claim owed the IRS is not dischargeable.  The IRS alleges that the Fletchers have attempted to conceal their ownership interest in a house located in Tulsa, Oklahoma, and also knowingly and fraudulently made false oaths in connection with their bankruptcy case.  The Fletchers deny these allegations.  Since the inception of this litigation, Lori Fletcher has died.  The IRS no longer objects to her discharge.

Previously, in response to a motion for summary judgment filed by the IRS (the "IRS Motion"),[6] this Court determined there was no genuine dispute as to the following material facts, and that they are considered established for purposes of this litigation:[7]

1. In 1998, the Fletchers incurred $1.6 million in federal income taxes based on their income of $7.2 million.

2. In 1999, the Fletchers incurred $378,000 in federal income taxes based on their income of $2.0 million.

3. The Fletchers failed to timely file their 1998 income-tax return: the 1998 return was due on August 15, 1999, but the Fletchers filed it on May 8, 2000.

---

[4]  *Case No. 11-12334-M.*

[5]  *Id.* at Docket No. 1, at 18, 20–22.

[6]  Docket No. 22.

[7]  *See* Memorandum Opinion, *at Docket No. 31*, and Judgment, *at Docket No. 32*, (hereafter the "Summary Judgment Order").

3

4.     Between 1998 and 2002, the Fletchers paid $416,641 toward their 1998 income taxes and $16,557 toward their 1999 income taxes.

5.     During the same period, the Fletchers used their cash—which they had realized from a 1998 initial public offering of Michael Fletcher's company—to build an 11,000-square-foot house (the "Sheridan Oaks House") in a gated community in Tulsa, Oklahoma.

6.     The Fletchers moved into the Sheridan Oaks House in December 2002, furnishing it with art and antiques that they had purchased, between 1998 and 2000, for more than $460,000.

7.     In October 2004, the IRS sued the Fletchers for a judgment on their 1998 and 1999 income taxes and to foreclose its liens on the Sheridan Oaks House.

8.     In February 2006, the Fletchers consented to a $2.7 million judgment for those taxes and agreed that the United States could auction off the Sheridan Oaks House if they were unable to sell it privately by a date certain.

9.     On May 29, 2008, the Sheridan Oaks House was sold by private sale for $2.85 million; after payment of senior liens and sale expenses, the United States received approximately $1.75 million of the proceeds.

10.    In April 2008—a month before the sale of the Sheridan Oaks House—Michael and Lori Fletcher contracted with Christopoulos Construction, LLC (the "April Contract") to purchase a newly constructed, 4,700-square-foot house located at 6209 E. 110th Street in Tulsa, Oklahoma (the "110th Street Property") for $735,000.

11.    The April Contract called for the Fletchers to pay a $5,000 earnest-money deposit

and for settlement to occur on or before May 19, 2008.

12.    In attempting to finance their purchase of the 110th Street Property, Michael Fletcher
       discussed the possibility of obtaining a mortgage loan with an individual named
       Jason Hadrava.

13.    The Fletchers devised a plan to have one of Michael Fletcher's employees, Tim
       Long, purchase the 110th Street Property and lease it back to them.

14.    In May 2008, the Fletchers signed an addendum that assigned their rights under the
       April Contract to Timax Properties, LLC,  a company owned by Tim Long.

15.    Tim Long and Timax Properties, LLC were unable to obtain financing to purchase
       the 110th Street Property.  As a result, in June 2008 Michael Fletcher proposed to the
       seller (Christopoulos Construction) that he and Lori Fletcher lease the property while
       they attempted to obtain the financing to purchase it.

16.    In June 2008, Michael Fletcher and Christopoulos Construction entered into a new
       contract for the purchase and sale of the 110th Street Property (the "June 2008
       Contract").   Under that contract, the purchase price remained at $735,000, the
       closing date was set for January 5, 2009, and Michael Fletcher agreed to provide an
       additional deposit of $235,000.  The June 2008 Contract acknowledged that the
       Fletchers had already made a $5,000 earnest-money deposit and expressly provided
       that additional deposits could be made before the closing.

17.    At the same time, the Fletchers and Christopoulos Construction entered into a lease
       that allowed the Fletchers to occupy the 110th Street Property through January 5,
       2009.

18.     As required by the June 2008 Contract, on or about June 13, 2008, Michael Fletcher delivered to Dean Christopoulos a cashier's check in the amount of $235,000 (the "Christopoulos Cashier's Check"). On the face of that check, Michael Fletcher is identified as the purchaser.

19.     Bank records reveal that Michael Fletcher purchased the Christopoulos Cashier's Check using two sources: (i) a $230,000 cashier's check payable to (and endorsed by) Tim Long (the "Tim Long Cashier's Check"), and (ii) $5,000 in cash that had been withdrawn from a bank account at Bank of America (the "Stonehenge Account") owned by Stonehenge Partners, Inc. ("Stonehenge") — a company that Michael and Lori Fletcher owned.

20.     Bank records reveal that Michael Fletcher purchased the Tim Long Cashier's Check on June 11, 2008, using money withdrawn from the Stonehenge Account.

21.     Less than a month before Michael Fletcher used funds in the Stonehenge Account to purchase the Tim Long Cashier's Check, Michael Fletcher arranged to have $350,000 deposited into that account.

22.     In May 2008, Susan Kapuchuck, the owner of an antiques store in Claremore, Oklahoma, agreed to pay the Fletchers $100,000 for various of the Fletchers' antiques.  Around that time, Michael Fletcher instructed Ms. Kapuchuck to make the payment by direct transfer into the Stonehenge Account.

23.     On May 16, 2008, the $100,000 payment from Ms. Kapuchuck was deposited into the Stonehenge Account.

24.     In May 2008, the Fletchers also made two agreements to sell various antiques and

household furnishings to Carlos and Pamela Langston, the buyers of the Sheridan Oaks House.  The first agreement, which was in writing, called for the Langstons to make four installment payments totaling $223,750.  The first installment, in the amount of $100,000, was paid on May 29, 2008—which was the date of the closing on the Sheridan Oaks House. The remaining installment payments were paid monthly between July and September 2008.

25.     All of those installment payments were transferred by wire into the Stonehenge Account.

26.     The Fletchers' second agreement with the Langstons was oral. Under that agreement, the Fletchers sold to the Langstons various chandeliers in the Sheridan Oaks House for $150,000.

27.     The $150,000 payment for the chandeliers was transferred by wire into the Stonehenge Account on May 29, 2008.

28.     Michael Fletcher instructed Mr. Langston to make the installment payments and the $150,000 chandelier payment by wire transfer into the Stonehenge Account.

29.     The Fletchers received a total of $473,750 from Ms. Kapuchuck and the Langstons in 2008.

30.     At the official meeting of creditors, however, Michael Fletcher testified that the Fletchers received $140,000 from the sale of their household furnishings in 2008.

31.     By an agreement signed on July 9, 2009 (the "Three-Party Agreement"), the Fletchers, Christopoulos Construction, and John Fletcher agreed that the $240,000 paid by the Fletchers under the June 2008 Contract would be applied toward the

purchase price under a new contract for the sale of the 110th Street Property between John Fletcher and Christopoulos Construction.  John Fletcher paid no consideration to the Fletchers for this agreement.[8]

32.    On the same day of the Three-Party Agreement (July 9, 2009), Christopoulos Construction contracted to sell the 110th Street Property to John Fletcher for $735,000.

33.    On or about July 13, 2009, John Fletcher applied for a mortgage loan from Associated Mortgage Corporation ("Associated Mortgage").

34.    In connection with that application, John Fletcher sent Associated Mortgage a letter, signed by Michael Fletcher and John Fletcher, stating that Michael Fletcher had or would give John Fletcher a gift of $240,000 that John Fletcher would use as down payment towards the purchase of the 110th Street Property (the "Gift Letter").

35.    John Fletcher subsequently withdrew his application with Associated Mortgage.  On or about August 31, 2009, John Fletcher applied for a mortgage loan with Regent Bank.  In September 2009, he borrowed $500,000 from Regent Bank and, together with his wife, Marilyn, took title to the 110th Street Property.[9]

36.    In connection with John Fletcher's application with Regent Bank, Michael Fletcher told a loan officer there that Michael Fletcher was the source of the $240,000 down payment that John Fletcher would use to purchase the 110th Street Property and that Michael Fletcher had already paid that amount to the seller.

---

[8]  John Fletcher is Michael Fletcher's father.

[9]  Marilyn Fletcher is Michael Fletcher's mother.

37.    Michael Fletcher also told the Regent Bank loan officer that the source of down-payment funds were proceeds of the sale of his antiques and other personal property.

38.    Since at least June 2008, the Fletchers have resided in the 110th Street Property. From June 2008 to September 2009 they leased it from Christopoulos Construction for $5,000 per month.  Since September 2009 the Fletchers claim to have leased the 110th Street Property from John Fletcher for $3,600 per month.

39.    Although John Fletcher is the maker on the mortgage note with Regent Bank, the Fletchers have made all of the payments on that note directly to the holder of the note and mortgage on the 110th Street Property.

40.    John Fletcher claims that he and his wife, on occasion, have lived in the 110th Street Property, but at his July 2012 deposition John Fletcher could not recall the dates he was there other than during Christmas and Easter of 2011.  In correspondence with Regent Bank in September 2010 (a year after the closing), John Fletcher listed his primary residence as a house in Poplar Grove, Illinois.  At his July 2012 deposition, John Fletcher testified that he resided in Poplar Grove, Illinois.

41.    John Fletcher claims that he borrowed the money he used as the down payment on the 110th Street Property from his granddaughters,  Amanda Fletcher ("Amanda") and Katherine Fletcher ("Katherine").[10]

42.    Michael Fletcher and Lori Fletcher also claim, in responses to interrogatories in this proceeding, that Amanda and Katherine were the source of the down payment.

_____

[10]  Amanda and Katherine are the daughters of Michael and Lori Fletcher.

9

43. As evidence of this debt, the Fletchers rely upon a promissory note (the "Note") that they claim John Fletcher issued to Amanda and Katherine.

44. The Note, dated April 1, 2008, is in the amount of $250,000 and is payable to Amanda and Katherine and their two trusts.

45. The Note bears a notary seal of one of Michael Fletcher's employees and purports to contain the signatures of Amanda and Katherine, as witnesses.

46. Katherine did not sign the Note and did not appear before the notary when the Note was executed.

47. There is no documentary evidence of any transfer of funds from Amanda and Katherine, or their trusts, to John Fletcher.

48. John Fletcher testified that he did not recall where the proceeds of the Note were deposited and that Michael Fletcher took control of the Note's proceeds.

49. John Fletcher testified that the reason for the lag between the date he claims to have signed the Note (April 1, 2008) and the date he and his wife purchased the 110th Street Property (September 30, 2009) was that the closing "took an extraordinar[ily] long time to complete."

50. John Fletcher did not enter into a contract to purchase the 110th Street Property until July 2009.

51. John Fletcher admits that no payments have been made on the Note and that its balance, as of July 2012, exceeds $250,000.

52. John Fletcher admits that he did not disclose his liability on the Note when he made his loan application to Associated Mortgage in July 2009.

10

53.     John Fletcher did not disclose his purported liability on the Note when he submitted a financial statement to Regent Bank in August 2009.

54.     John Fletcher did not disclose his liability on the Note when he submitted a second financial statement to Regent Bank in September 2010.

55.     As to the Gift Letter, John Fletcher claims that he was playing his role in a charade that the mortgage company was aware of.

56.     The Fletchers filed a joint Chapter 7 petition on August 12, 2011.

57.     The Fletchers listed no real property on their bankruptcy schedules.

58.     At the meeting of creditors, Michael Fletcher testified that his children's trusts provided the down payment for the purchase of the 110th Street Property, that he did not contribute to the down payment, and that he had no ownership interest in that property.

59.     In May 2012, the Fletchers answered interrogatories in this adversary proceeding in which they claim that Amanda and Katherine were the source of the down payment used to purchase the 110th Street Property.

60.     In September 2009, Michael Fletcher submitted a personal financial statement to Regent Bank.

61.     According to that statement, the Fletchers at that time owned personal property—in the form of art, antiques, collectibles, and other household furnishings—worth more than $688,000.

62.     The financial statement included a spreadsheet providing piece-by-piece details—purchase date, dealer, item description, and original purchase price—for art

11

and antiques worth over $460,000.

63.     On their bankruptcy schedules, the Fletchers listed only $8,600 in household goods
        and furnishings, and they listed no antiques or collectibles.

As stated in the Summary Judgment Order, the Court was unable to resolve this matter at the summary judgment stage because of the mandate that "the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion,"[11] particularly with respect to any fraudulent intent of the parties involved.[12] The primary issues of fact remaining to be litigated involve 1) whether the Fletchers held an interest in the 110th Street Property before and on the Petition Date; 2) the nature of the Fletchers' interest in assets found in the Fletchers' home that were confiscated by the IRS post-petition; and 3) whether Michael Fletcher exhibited the requisite knowing and fraudulent intent with respect to his actions to warrant the denial of his discharge.  This case was tried to the Court on October 1–2, 2014.  The following additional facts are based on testimony and evidence received at trial.

**The Fletchers' interest in the 110th Street Property**

On May 7, 2008, Defendant sent an email to his realtor, Peter Walter, with the following message:

---

[11]  *Becker v. Bateman,* 709 F.3d. 1019, 1022 (10th Cir. 2013) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[12]  "As a general rule, questions involving a person's intent or other state of mind cannot be resolved by summary judgment." *In re Herrman*, 355 B.R. 287, 291 (Bankr. D. Kan. 2006). *See also Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Questions of intent involve many intangible factors, such as witness credibility, that are best left to the consideration of a factfinder after a full trial."); *In re Nevarez*, 415 B.R. 540, 544 (Bankr. D.N.M. 2009); *see* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2730 (3d ed. 1998).

"Broadmoor House: We want to assign our contract to another entity for tax planning and estate purposes. I will have the exact name of the entity tomorrow. I should also have an acceptance letter for the financing tomorrow as well. We are putting $235,000 down and financing $500,000[.] Do we need to do anything to ammend [sic] the contract for the new entity?"[13]

On or about July 13, 2009, John Fletcher applied for a mortgage loan from Associated Mortgage.[14] In that application, John Fletcher represented to Associated Mortgage that 1) the "Builder" was holding a cash deposit of $250,000; and 2) no part of the down payment was borrowed.[15] There is no mention of his supposed obligation on the Note to Amanda and Katherine. Nor is there any disclosure of his obligation on the Note in the personal financial statement submitted to Regent Bank in September 2010.

In order to document the various loans and transfers among and between Amanda, Katherine, John Fletcher, and Michael and Lori Fletcher, Defendant presented three powers of attorney in addition to the Note.[16] The first purports to appoint Michael Fletcher as attorney-in-fact for Amanda (the "Amanda POA"),[17] for the purpose of selling Amanda's personal property located at the Sheridan Oaks House. The Amanda POA is dated March 15, 2008. Amanda testified that she executed the Amanda POA on her own behalf. Amanda testified that she also executed the document on behalf of her sister, Katherine, whose signature appears over the word "witness." The

---

[13] United States Trial Exhibit No. 9. In his testimony, Defendant affirmed that the "Broadmoor House" referred to in the email was the property herein referred to as the 110th Street Property.

[14] *See supra* Findings of Fact No. 33.

[15] *See* United States Trial Exhibit No. 62, at 3 § VIII (h).

[16] *See supra* Findings of Fact Nos. 41–46.

[17] Defendant's Exhibit No. 102.

13

Amanda POA is acknowledged by Theresa Wild ("Ms. Wild") as a notary public.  She indicates that both Amanda and Katherine (as well as Michael Fletcher) appeared before her personally.  Ms. Wild, an employee of Michael Fletcher, is the same individual that acknowledged the Note.

The second power of attorney purports to appoint Michael Fletcher as attorney-in-fact for Katherine (the "Katherine POA").[18]  The Katherine POA is for the stated purpose of giving Michael Fletcher the authority to sell personal property belonging to Katherine located at the Sheridan Oaks House, and is also dated March 15, 2008.  Amanda testified that she also signed Katherine's name to this document, and then signed her own name as having witnessed Katherine's signature.  She testified to her understanding that such was allowed because she is the named trustee of a trust belonging to Katherine.  The Court notes that the Katherine POA does not mention property belonging to any trust, only property belonging to Katherine herself.  Nor does the signature block make any reference to a trustee.  Ms. Wild also acknowledged the Katherine POA, indicating that both Katherine and Amanda appeared before her on March 15, 2008.

The third power of attorney is dated April 1, 2008.  On that date, John Fletcher purportedly appointed Michael Fletcher as his attorney-in-fact and gave him the authority to purchase the 110th Street Property on John Fletcher's behalf (the "John Fletcher POA").[19]  This is one day before the Fletchers executed the April Contract to purchase the 110th Street Property.  The John Fletcher POA was also acknowledged by Ms. Wild.  Ms. Wild did not testify at trial.  The Court finds that her notarizations prove nothing.  The Court is not convinced that any of these documents (the Amanda POA, the Katherine POA, the John Fletcher POA, and the Note) bear the weight of authenticity that

---

[18]  Defendant's Exhibit No. 103.

[19]  Defendant's Exhibit No. 101.

comes with a valid notarization.

***The Fletchers' interest in certain art and antiques located at the 110th Street Property***

In the bankruptcy schedules, the Fletchers listed household goods and furnishings valued at $8,000 as follows:

> Household goods, furnishings, appliances, electronics (king size bed and 2 full size beds, kitchen table and 4 chairs, dining room table and 6 chairs, 2 couches, recliner, coffee table, tv, pots, pans, eating utensils).[20]

In addition, under the category reserved for "Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles", the Fletchers listed "Books, DVDs, VHS Tapes" valued at $600.[21]  In their Statement of Financial Affairs ("SOFA") filed with their bankruptcy schedules, the Fletchers indicated that they did not hold or control any property owned by another person.[22]

In September 2009, Defendant submitted a personal financial statement to Regent Bank that included a spreadsheet (the "2009 Spreadsheet") listing 98 separate items described as art and antiques owned by the Fletchers (the "Art & Antiques") with a purchase price of over $460,000.[23] In addition to the Art & Antiques, the financial statement represented that the Fletchers owned $85,000 worth of "Collectibles" and $135,000 worth of "Household furnishings." On June 26, 2013,

---

[20]  *See supra* Findings of Fact No. 63; United States Trial Exhibit No. 15, at 4.

[21]  *Id.*

[22]  *See Case 11-12334-M, Docket No. 1*, at 35 (Question 14); United States Trial Exhibit No. 16.

[23]  *See supra* Findings of Fact Nos. 60–62.

Lori Fletcher gave a deposition during which she was asked about the Art & Antiques.[24]  Lori Fletcher testified that 1) she personally purchased the items on the date indicated on the 2009 Spreadsheet;[25] 2) except for a few items, most of the Art & Antiques listed remained at the 110th Street Property;[26] and 3) several of the items listed belonged to her in-laws, John and Marilyn Fletcher, although she could not recall how they came to own those items, or to her daughters, Amanda and Katherine, who received the items as gifts from Michael and Lori Fletcher, although she could not recall a single detail about how or when such gifts were made.  When asked if she disclosed the Art & Antiques in her bankruptcy schedules, Lori Fletcher testified to her understanding that all personal property remaining in her possession, including the Art & Antiques, fell into the category of "household furnishings."

Following Lori Fletcher's deposition, on August 5, 2013, the IRS conducted a seizure of assets from the 110th Street Property led by Stuart Anderson ("Mr. Anderson"), the lead IRS revenue officer assigned to the Fletchers' case.   Mr. Anderson limited his seizure to the Art & Antiques listed on the 2009 Spreadsheet.[27]  Michael Fletcher assisted Mr. Anderson by carefully marking each piece of property prior to the seizure.  The Fletchers informed Mr. Anderson that 8 items from the 2009 Spreadsheet had previously been sold or transferred to either the Langstons or

---

[24]  *See* United States Trial Exhibit No. 61, at 85.  Any remaining relevance objection to United States Trial Exhibit No. 61 is hereby overruled.

[25]  *Id.*

[26]  Lori Fletcher testified that a small number of the items were previously included in the sales to either the Langstons or Kapuchucks, and should not have been included on the 2009 Spreadsheet.

[27]  Defendant's Exhibit No. 129.

the Kapuchucks, and were no longer on the premises.[28]

Mr. Anderson testified that he photographed each item seized.  The Art & Antiques taken from the 110th Street Property (the "Seized Property") filled one 26-foot trailer, a stretch trailer, and part of a second 26-foot trailer.  Mr. Anderson estimated that his agents seized approximately 40% of the total furniture in the house.  He testified that there was a significant amount of furniture remaining in the home after the seizure, including: a dining room table with 6 chairs, three fully furnished bedrooms, two televisions, a sofa, a love seat, another table, additional artwork, and books. In addition, Defendant testified that among the property remaining in the 110th Street Property after the seizure was: all mattresses and bedding from seized beds, a sofa, recliner, a flat screen TV, a kitchen table with 4 chairs.

After the seizure, the IRS commissioned Philip Dutcher to conduct an appraisal of the Seized Property.  He appraised the Seized Property at $41,666.00.  Because of the forced nature of the sale, the fact that an unwilling seller was involved, and that the property was being sold "as is, where is" with no warranty or guarantee of clear title, a minimum bid price was placed on the property of $24,999.60.  This was later lowered to $20,000 to accommodate the actual bid price of $20,270.

Defendant testified that many of the items of personal property remaining in the 110th Street Property after the seizure belonged to his parents or his daughters.  He indicated that property belonging to his parents had been moved from the Sheridan Oaks House to the 110th Street Property.  Defendant testified that, although he was aware that the 110th Street Property was filled with property belonging to others, he was not required to disclose that in his SOFA because he did not "control" that property.

---

[28] *See* United States Trial Exhibit No. 17.

To the extent the "Conclusions of Law" contain any items that should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Burden of Proof

In order to prevail on an objection to discharge, Plaintiff must prove each statutory element by a preponderance of the evidence.[29]  Once Plaintiff establishes a *prima facie* case for denying Defendant's discharge under § 727, the burden of going forward shifts to Defendant.[30]  The ultimate burden, however, remains with Plaintiff.[31]  In order to further the policy of providing a debtor with a "fresh start," "the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor."[32]  Even so, "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor."[33]

### Conclusions of Law

***Section 727(a)(2)(A)***

Section 727(a)(2)(A) of the Code provides that a discharge may be denied where

the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

---

[29] *See* Fed. R. Bankr. P. 4005.  *See also First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991); *cf. Grogan v. Garner*, 498 U.S. 279 (1991).

[30] *See Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir. 1984); *Everspring Enters., Inc. v. Wang (In re Wang),* 247 B.R. 211, 214 (Bankr. E.D. Tex. 2000).

[31] *See First Union Nat'l Bank v. Golob (In re Golob),* 252 B.R. 69, 75 (Bankr. E.D. Va. 2000) (citing *Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244, 249 (4th Cir. 1994)).

[32] *Mathai v. Warren (In re Warren),* 512 F.3d 1241, 1248 (10th Cir. 2008) *(*quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997)).

[33] *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996).

(A) property of the debtor, within one year before the date of the filing of the petition[.][34]

This exception to discharge consists of two critical pieces: 1) an act, i.e, a transfer or a concealment, involving property of the debtor; and 2) a subjective intent to hinder, delay, or defraud a creditor.[35] Both the act and the intent must be present during the one year before the petition date. "Anything occurring before that one year period is forgiven."[36]

The bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[37] Where a transfer of legal title occurred more than one year prior to a bankruptcy filing, but a debtor retained a secret interest in the transferred property, courts have applied the doctrine of continuing concealment.[38] "This doctrine does not negate the 'act' requirement of § 727 but merely recognizes that a failure to reveal property previously concealed can, in some circumstances, properly be considered culpable conduct during the year before

---

[34] § 727(a)(2)(A).

[35] *Rosen v. Bezner,* 996 F.2d 1527, 1531 (3d Cir. 1993). *See also In re Warren*, 512 F.3d at 1249 ("[A] party objecting to a discharge under this section 'must show by a preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor.'" (quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997))).

[36] *Rosen*, 996 F.2d at 1531.

[37] § 541(a)(1).

[38] *See Wieland v. Gordon (In re Gordon),* 509 B.R. 359, 371 (Bankr. N.D. Okla. 2014), *aff'd*, No. 14-018, 2015 WL 1009830, __ B.R. __ (10th Cir. BAP March 9, 2015); *Garland v. United States (In re Garland)*, 385 B.R. 280 (Bankr. E.D. Okla. 2008), *aff'd sub nom. U.S. Trustee v. Garland (In re Garland)*, 417 B.R. 805 (10th Cir. BAP 2009).

bankruptcy warranting a denial of discharge."[39]   The focus is not on the transfer itself, but on

whether the debtor has retained a secret interest in property that remains concealed during the

critical period with the requisite improper intent.[40]   Courts have consistently found that the

concealment of a secret beneficial interest in property that continues into the year before bankruptcy

is within the reach of § 727(a)(2)(A).[41]   As stated by the United States Court of Appeals for the

---

[39]   *Rosen,* 996 F.2d at 1531.

[40]   *Id.*  (There are "two critical elements necessary to support application of the doctrine, namely, that [the debtor] had a property interest to 'conceal' and, that his concealment of this interest, if it existed during the year before bankruptcy, was motivated by an improper intent.").

[41]   *Wieland v. Gordon (In re Gordon)*, No. 14-018, 2015 WL 1009830, __ B.R. __, at *7 (10th Cir. BAP March 9, 2015) ("Concealment of assets with the intent to 'hinder, delay, or defraud a creditor' within one year of filing a bankruptcy petition constitutes a violation of § 727(a)(2)."), *aff'g* 509 B.R. 359 (Bankr. N.D. Okla. 2014); *U.S. Trustee v. Garland (In re Garland)*, 417 B.R. 805, 816 (10th Cir. BAP 2009) ("[B]ankruptcy courts have determined that, despite an unqualified transfer of legal title, debtors who retain beneficial use of the property and treat it as their own continue to hold a beneficial interest that must be disclosed."), *aff'g* 385 B.R. 280 (Bankr. E.D. Okla. 2008); *Coady v. D.A.N. Joint Venture III, L.P. (In re Coady)*, 588 F.3d 1312, 1316 (11th Cir. 2009) ("The doctrine of continuing concealment provides for situations like this, in which a debtor has kept his assets out of a creditor's reach during the look-back period by means of a sham ownership arrangement established more than one year before the bankruptcy petition was filed."); *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997) ("Under the 'continuing concealment' doctrine, a transfer made and recorded more than one year prior to filing may serve as evidence of the requisite act of concealment where the debtor retains a secret benefit of ownership in the transferred property within the year prior to filing."); *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 684 (6th Cir. 2000) (same); *Rosen v. Bezner*, 996 F.2d at 1531 ("Under the 'continuous concealment' doctrine, a concealment will be found to exist during the year before bankruptcy even if the initial act of concealment took place before this one year period as long as the debtor allowed the property to remain concealed into the critical year."); *Thibodeaux v. Olivier ( In re Olivier)*, 819 F.2d 550, 553 (5th Cir. 1987) ("Concealing property for purposes of section 727(a)(2)(A) can be accomplished by a transfer of title coupled with the retention of the benefits of ownership."); *Friedell v. Kauffman (In re Kauffman)*, 675 F.2d 127, 128 (7th Cir. 1981) ("The transfer of title with attendant circumstances indicating that the bankrupt continues to use the property as his own is sufficient to constitute a concealment."); *Korte v. United States (In re Korte)*, 262 B.R. 464, 472 (8th Cir. BAP 2001) ("Relevant to this case, concealment is a continuing event and under the established doctrine of 'continuing concealment,' a concealment that originated outside the one year limitation period is within the reach of § 727(a)(2)(A) if the concealment continued on into the year preceding the

Third Circuit,

> In a situation involving a transfer of title coupled with retention of the benefits of ownership, there may, indeed, be a concealment of property.  Where this is the case, however, the concealment is present not because retention of the benefits of ownership conceals the fact that the debtor no longer has legal title, but rather because the transfer of title represents to the world that the debtor has transferred away all his interest in the property while in reality he has retained some secret interest—a secret interest of which retention of the benefits of ownership may be evidence.  A legally relevant concealment can exist, however, only if there is, in fact, some secret interest in the property retained by the debtor.[42]

In addition to finding that a debtor retained a secret interest in property that was concealed during the one-year period immediately preceding bankruptcy, a court must also find that such concealment was done with the actual intent to hinder, delay, or defraud a creditor during the same period.  "To deny a discharge under § 727(a)(2), a court must find *actual* intent to defraud creditors.  Because rare is the occasion when a party lays bare his or her subjective intent, fraudulent intent . . . may be established by circumstantial evidence, or by inferences drawn from a course of conduct."[43]  Among the badges or indicia from which a court may infer fraudulent intent are "situations in which a debtor conceals prebankruptcy conversions; converts assets immediately before the filing of the bankruptcy petition; gratuitously transfers property; continues to use transferred property; and transfers property to family members."[44]  The Court of Appeals for the

---

filing coupled with the requisite intent. . . . Asset concealment is typically found to exist where the interest of the debtor in property is not apparent but where actual or beneficial enjoyment of that property continued.") (internal citations omitted); *R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes)*, 229 B.R. 253 (1st Cir. BAP 1999) (same).

[42]  *Rosen,* 996 F.2d at 1532 (cited with approval in *In re Gordon*, No. 14-018, 2015 WL 1009830, at *8).

[43]  *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008).  *See also Farmers Co-op. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982).

[44]  *In re Carey*, 938 F.2d 1073, 1077 (10th Cir. 1991) (citations omitted).

Tenth Circuit has stated that "the inference of fraudulent behavior flowing from a concealment is greater than from a transfer[.]"[45]  The monetary value of the assets converted is also a factor in determining whether the debtor acted with fraudulent intent.[46]  Where a debtor is found to possess the requisite intent to defraud under § 727(a)(2), "[d]etriment to a creditor need not be shown in order to establish fraudulent concealment or a false oath barring discharge."[47]

Under Oklahoma law, "[t]here is a statutory presumption that every estate in land granted by a deed shall be deemed an estate in fee simple unless limited by express words."[48]  "When a transfer of real property is made to one person, and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made."[49]  Such is commonly referred to as a "resulting trust."  The Supreme Court of Oklahoma has described a resulting trust as follows:

> Resulting trusts are those which arise where the legal estate in property is disposed of or acquired, not fraudulently or in violation of any fiduciary duty, but the intent appears or is inferred from the terms of the disposition, or from the accompanying facts and circumstances, that the beneficial interest is not to go to or be enjoyed with the legal title. In such a case, a trust is implied or results in favor of the person for whom the equitable interest is assumed to have been intended, and whom equity

---

[45] *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 n.1 (10th Cir. 1997).

[46] *In re Carey*, 938 F.2d at 1077.

[47] *Strunk*, 671 F.2d at 396.  *See also In re Gordon*, No. 14-018, 2015 WL 1009830, at *8–10.

[48] *Cleary Petroleum Corp. v. Harrison*, 621 P.2d 528, 532 (Okla. 1980) (citing Okla. Stat. tit. 16, § 29, "Every estate in land which shall be granted, conveyed or demised by deed or will shall be deemed an estate in fee simple and of inheritance, unless limited by express words.").

[49] Okla. Stat. tit. 60, § 137.

deems to be the real owner.[50]

Oklahoma courts place a high burden of proof on the party seeking to establish such a trust.[51]

The series of contracts between the Fletchers and Christopoulos Construction for the purchase of the 110th Street Property tell the real story in this case. Even as they made the original April Contract to purchase the 110th Street Property, the Fletchers knew, based on their recent experience with the Sheridan Oaks House, that they could not take title to the home in their own names for fear of attracting the attention of the IRS. Funds can be traced directly from the sale of personal property originally purchased by the Fletchers to the Langstons and Kapuchecks into the Stonehenge Account. These funds were used to make the additional down payment of $235,000 toward the purchase of the 110th Street Property to Christopoulos Construction under the June 2008 Contract.

Thus began an elaborate scheme designed by Defendant to use his own funds to purchase the home in someone else's name and ostensibly "rent" it from that person. Defendant initially tried to pull Tim Long and Timax Properties, LLC into the role of nominal purchaser, but that fell apart when they were unable to get financing. Defendant ultimately enlisted his parents and daughters to play their respective parts:

> — *Amanda and Katherine Fletcher*: claiming to be the owners of vast quantities of art and furniture that they had never known outside of the Sheridan Oaks House.

---

[50] *Powell v. Chastain*, 318 P.2d 859, 862 (Okla. 1957).

[51] *Cacy v. Cacy*, 619 P.2d 200, 202 (Okla. 1980) ("A constructive or resulting trust arises entirely by implication of law, irrespective of contract. Although the Statute of Frauds does not preclude the establishment of such trusts by parol evidence, it is difficult to prove their existence. Evidence must be clear, unequivocal and decisive beyond a reasonable doubt. A mere preponderance of the evidence is not sufficient. Evidence of the most satisfactory kind must be produced by the party seeking to establish the trust.") (footnotes omitted).

23

— *John and Marilyn Fletcher*: willing to lend their names and access to credit to secure a mortgage on the 110th Street Property.

More than 15 months after executing the April Contract with Christopoulos Construction, the parties transferred all of the Fletchers' interest in the contract to John Fletcher under the Three-Party Agreement. No consideration was given by John Fletcher, except, perhaps, his willingness to be party to this charade.

Defendant has crafted a narrative suggesting that Amanda and Katherine were the owners of personal property located at the Sheridan Oaks House; that the sale of their property generated funds that were then loaned to John Fletcher in order to purchase the 110th Street Property; that John Fletcher was always the intended purchaser, owner, and future tenant of the 110th Street Property; and that Defendant was acting only as attorney-in-fact when he executed the various contracts for that property. The Court finds that the notary public that executed the documents presented to support Defendant's story (i.e., the Amanda POA, the Katherine POA, the Note, and the John Fletcher POA) has no credibility. The Court has no confidence in the veracity or authenticity of these documents. Reference to the Note from John Fletcher to Amanda and Katherine only exists in documents among and between family members. Reference to the loan or Note is conspicuously missing from both the loan application submitted by John Fletcher to Associated Mortgage in 2009, and his personal financial statement submitted to Regent Bank in 2010.

The Court finds that the down payment of $235,000 on the 110th Street Property came from the sale of the Fletchers' personal property from the Sheridan Oaks House. Defendant has not presented any credible evidence that the property sold to the Langstons and/or Kapuchucks belonged to anyone other than the Fletchers. The Court finds the supposed loan of funds from Amanda and Katherine to John Fletcher to be a sham. Additionally, the evidence shows that the Fletchers made

24

every payment on the mortgage for the 110th Street Property directly to Regent Bank. While John and Marilyn Fletchers' names may be on the title, Michael and Lori Fletcher were the equitable owners—holding all but legal title—of the 110th Street Property. The Court finds that John Fletcher held title to the 110th Street Property in resulting trust for Michael and Lori Fletcher.[52]

Michael Fletcher took great pains to conceal his interest in the 110th Street Property from the IRS, both before and after filing for bankruptcy relief. His experience with the Sheridan Oaks House taught him that the IRS would not hesitate to foreclose and liquidate any interest he held in real property. The Court finds that Defendant's actions of placing his father's name on the legal title to the 110th Street Property and setting up his father as its mortgagee were conscious, deliberate, knowing actions designed to conceal the Fletchers' interest in the property. That concealment continued during the one year prior to the filing of the Fletchers' bankruptcy petition. Defendant's failure to disclose his interest in the 110th Street Property on Schedule A was a further continuation of the concealment.[53]

---

[52] The finding of a resulting trust is not necessary to this litigation, but it provides a useful vocabulary to discuss the Fletchers' beneficial interest in the 110th Street Property. As further support for the finding of a resulting trust, the Court notes that if John and Marilyn Fletcher had found themselves in bankruptcy court, there is no doubt that Michael Fletcher would have been the first to assert his true ownership interest in the 110th Street Property.

[53] This case has much in common with the recent decision in *Wieland v. Gordon (In re Gordon)*, No. 14-018, 2015 WL 1009830, __ B.R. __ (10th Cir. BAP March 9, 2015), *aff'g* 509 B.R. 359 (Bankr. N.D. Okla. 2014). In *Gordon*, the debtor had transferred property and the funds to acquire property to his spouse, who assumed legal title to all of the real and personal property held by the family. The debtor then disavowed any interest in said property in his transactions with creditors and the bankruptcy court. The Bankruptcy Appellate Panel for the Tenth Circuit concluded that the debtor's transfer of legal title to real property was not a valid transfer, but was instead a fraudulent concealment of the property from his creditors. The court also concluded that the debtor's maintenance of the ruse, up to and during the bankruptcy proceedings, constituted a continuing concealment subject to the reach of § 727(a)(2).

The Court also finds that Michael Fletcher had the actual subjective intent to hinder, delay, or defraud the IRS from gaining access to his interest in the 110th Street Property. This case exhibits several badges of fraud, including the pre-bankruptcy transfer of title to the 110th Street Property to John and Marilyn Fletcher, while Michael and Lori Fletcher maintained a secret equitable interest; the fact that the transfer was among close family members; the gratuitous nature of the transfer; and that Michael and Lori Fletcher continued to use the 110th Street Property exclusively after the transfer and secretly maintained all the benefits of home ownership. These badges provide sufficient evidence for the Court to conclude that Michael Fletcher had the requisite fraudulent intent to be denied a discharge in this case.

Plaintiff has met its burden under § 727(a)(2)(A). Defendant shall be denied a discharge pursuant to that section.

### Section 727(a)(4)(A)

Section 727(a)(4)(A) of the Code provides that a discharge may be denied where the debtor "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account[.]"[54] The United States Court of Appeals for the First Circuit has held that

> the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.[55]

---

[54]  § 727(a)(4)(A).

[55]  *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) (citations omitted).

26

The Fourth Circuit has held that

> [i]n order to be denied a discharge under this section [§727(a)(4)(A)], the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud. The false oath made by the debtor must have related to a material matter. Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact.[56]

A statement contained in a debtor's schedules or statement of affairs, or the omission of assets from the same, may constitute a false oath for purposes of § 727(a)(4)(A).[57] Omitted information has been deemed material where it "concern[s] the existence and disposition" of a debtor's property.[58] Because the debtor is usually the only person able to testify directly concerning intent, "fraudulent intent may be deduced from the facts and circumstances of a case."[59] The United States Court of

---

[56] *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987) (citations omitted). *See also Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997) ("In order to deny a debtor's discharge pursuant to this provision [§ 727(a)(4)(A)], a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact.").

[57] *See Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir. 1990).

[58] *Id.* (citing *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)).

[59] *Id.* at 955–56. Although not directly on point, the Court has found helpful certain cases dealing with revocation of discharge for failure to disclose assets under § 727(d)(2). The United States Court of Appeals for the Seventh Circuit has held that

> [t]o find the requisite degree of fraudulent intent, the court must find the debtor knowingly intended to defraud the trustee, or engaged in such reckless behavior as to justify the finding of fraud. The trustee may prove the debtor's fraud by evidence of the debtor's awareness of the omitted asset and by showing that the debtor knew that failure to list the asset could seriously mislead the trustee or that the debtor acted so recklessly in not reporting the asset that fraud is implied. The bankruptcy court's finding of fraudulent intent may be based on inferences drawn from a course of conduct. Additionally, fraudulent intent may also be inferred from all of the surrounding circumstances.

*In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992) (citations omitted). *See also Kaler v. Olmstead (In re Olmstead)*, 220 B.R. 986, 994 (Bankr. D.N.D. 1998) (quoting *Yonikus*); *Rezin v. Barr (In*

Appeals for the Tenth Circuit has provided further guidance in the application of § 727(a)(4)(A), holding that "[a] debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence."[60]  We have also been instructed that "an honest error or mere inaccuracy is not a proper basis for denial of discharge."[61]  On the other hand, a debtor may not escape a denial of discharge under § 727(a)(4)(A) by asserting that the omitted information concerned assets he or she believed to be exempt or worthless.[62]

The IRS claims that Defendant knowingly and fraudulently made a false oath or account in this case based on the omission of substantial personal property from the Defendant's bankruptcy schedules.  The IRS presented evidence that Defendant presented a personal financial statement to Regent Bank in September 2009.  That statement was accompanied by the 2009 Spreadsheet, representing that the Fletchers owned the Art & Antiques, which had been purchased for over $468,000.  By listing the Art and Antiques as assets used to calculate their net worth, the Fletchers at least implied that the property had maintained its value.  The Fletchers represented to Regent Bank that they held additional personal property described as "Collectibles" and "Household Furnishings, valued at $85,000 and $135,000, respectively.  The IRS also presented Lori Fletcher's deposition testimony that almost all of the Art & Antiques remained in the 110th Street Property as of the date of the Fletchers' bankruptcy filing.  The IRS later confirmed this statement through a

---

*re Barr)*, 207 B.R. 168, 176 (Bankr. N.D. Ill. 1997) (fraud "may be proven by evidence that Debtors were aware the omitted assets existed and that they knew failure to list the assets would mislead creditors or the Trustee").

[60]  *In re Brown*, 108 F.3d at 1294.

[61]  *Id.* at 1295.

[62]  *In re Calder*, 907 F.2d at 955 (citing *In re Chalik*, 748 F.2d 616 (11th Cir. 1984)).

seizure and subsequent sale of the property, which netted over $20,000.

Defendant presents several defenses to the allegation that he knowingly and fraudulently omitted the Art & Antiques from his bankruptcy schedules. First, he argues that the Art & Antiques had little value, and therefore need not have been disclosed. The fact that the property sold essentially under "fire sale" conditions for approximately $20,000 is only part of the story. Twenty thousand dollars may not be a fortune, but the Court finds that, in this context, it is material. Less than two years before the petition date, the Fletchers represented to Regent Bank that the property should be considered an asset valued at roughly $468,000. Even if the Fletchers believed the property to be worthless as of the date of the bankruptcy petition, they are not excused from omitting it from their schedules.

Similarly, the Fletchers both testified to their belief that the Art & Antiques were generally described under the category of "household furnishings." Their own schedules betray them. The schedules are quite specific, and describe the household furnishings down to the number of chairs to accompany each table. Both Mr. Anderson and Michael Fletcher testified that a large amount of property remained after the IRS seizure, including items that specifically met the description of household furnishings from the Fletchers' schedules. Evidence shows that the Fletchers kept meticulous records regarding their personal property. The failure to schedule more than two truckloads worth of high-end antique furniture in their home was not a simple oversight.

Defendant presented testimony that several of the Art & Antiques were owned by his parents or his daughters on the petition date. The Court finds this testimony a complete fabrication. Lori Fletcher testified that she recognized every item on the 2009 Spreadsheet as something she had purchased. Although she claimed that some of the items belonged to others, she could not recall a

29

single incident or occasion when she had made any gift or other disposition of the property.  The Fletchers were quite willing to flexibly define the "owner" of property amongst family members, depending on the needs of the current situation.  Michael Fletcher was always in control of the Art & Antiques.  They were included in the Fletchers' 2009 personal financial statement to Regent Bank when it suited their interests to appear to hold substantial assets. Now that it is more convenient to disclaim their interest in the Art & Antiques, they have done so.  The Court finds that all of the Art & Antiques belonged to the Fletchers on the date of their bankruptcy filing, and that they were fraudulently and knowingly omitted from their schedules in an effort to keep them out of the bankruptcy estate.  The Court finds this is sufficient to deny Defendant a discharge pursuant to § 727(a)(4)(A).

### Conclusion

The Court is mindful that objections to discharge should be construed liberally in favor of debtors and strictly against objecting parties.  However, a bankruptcy discharge is a privilege reserved for the honest debtor.  Plaintiff has met its burden by a preponderance of the evidence with respect to Defendant.  Defendant has not presented sufficient evidence to overcome this conclusion.  The discharge of Defendant should be denied under § 727(a)(2)(A) and (4)(A).  As a result, the relief requested under § 523(a)(1)(C) is rendered moot.

Defendant shall not be granted a discharge in Case No. 11-12334-M.  A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 13th day of March, 2015.

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

30

6848.6